1

2

3                                                              **O**

4

5                                                        NO JS-6

6

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10

11  MULTI TIME MACHINE, INC.,        )  Case No. CV 11-09076 DDP (MANx)

12                                   )
                                     )
13                    Plaintiff,     )  **ORDER GRANTING DEFENDANT'S MOTION**
                                     )  **FOR SUMMARY JUDGMENT**
14                                   )
                                     )  [Dkt. Nos. 35 & 45 ]
15       v.                          )

16                                   )

17  AMAZON.COM, AND AMAZON           )
    SERVICES LLC,
18                                   )

19                    Defendant.     )

20                                   )

21  _____

22

23       Presently before the court is Defendants Amazon.com, Inc. and

24  Amazon Services LLC (collectively "Amazon")'s Motion for Summary

25  Judgment.[1]  Having considered the parties' submissions and heard

26  oral argument, the court adopts the following order.

27  _____

28       [1] The identical Motion was filed twice, one in a redacted
    version (Dkt. No. 35) and once unredacted and under seal (Dkt. No.
    45). This order contains no confidential facts but pertains to both
    versions of the Motion.

**I. BACKGROUND**

The following facts are not disputed or confidential.

Multi Time Machine, Inc. ("MTM") sells military style watches under the brand names "MTM Special Ops" and "MTM Military Ops." (In Support of Amazon's Motion for Summary Judgment, Decl. of Marc Levy ["Levy Decl."], Exh. A 21:5-8.) MTM sells its watches through its website and through a limited number of authorized distributors, but not through Amazon.  (Id. at 39:10-40:5, 48:9-15). In addition, MTM does not authorize its distributors to sell its watches on Amazon. (Id. at 49:24-51:11.)

Amazon is an online retailer that sells millions of products directly to consumers and that hosts third-party sellers. (In Support of Amazon's Motion for Summary Judgment, Decl. of Daniel Rose ["Rose Decl."] ¶ 2.) Amazon's search function attempts to retrieve products that consumers are likely to be interested in purchasing. (Id. at ¶ 3.) To do so, its search function does not only provide results that match the actual words used by the consumer in his or her query. (Id. at ¶ 7.) Like Google and Bing, Amazon's search engine employs search technologies that rely on consumer behavior.  (Id. at ¶¶ 4, 7). These technologies allow Amazon to retrieve results that do not include the search term. (Id. at ¶ 7.)

In response to a consumer's search, Amazon provides the consumer a list of products on a search results page. (In Support of Amazon's Motion for Summary Judgment, Decl. of Paul Jaye ["Jaye Decl."] ¶ 6, Exh. A.) For each product, Amazon generates a "product listing," which primarily consists of an image of the product and a title identifying the product. (Id.) For example, when a consumer

searches for "mtm special ops," Amazon's search function provides ten results, each with its own product listing. (<u>Id.</u>) Since MTM does not sell its watches on Amazon or authorize its distributors to sell its watches on Amazon, its watches do not appear among the product listings for that search. (<u>Id.</u>) Instead, all of the watches retrieved by Amazon belong to MTM's competitors, in particular Luminox and Chase-Durer. (<u>Id.</u> at Exh. A; Levy Decl., Exh. A at 59:25-60:5.)

**A. Search Results Page**

On the search results page, the search query—"mtm special ops"—appears in two locations: in the search query box and directly below the search query box in what is termed the "breadcrumb." (Jaye Decl. at ¶ 7.) The breadcrumb displays the original query in quotation marks to provide a trail for the consumer to follow back to the original search. (<u>Id.</u>) Directly below the breadcrumb, Amazon provides "Related Searches" in case consumers are unsatisfied with the results from their original search.  (<u>Id.</u> at ¶ 8, Exh. A.) For example, after searching for the term "mtm special ops," Amazon's search results page suggests the related search "mtm special ops watch." (<u>Id.</u> at Exh. A.)

Accordingly, after searching for "mtm special ops" in Amazon's search query box, those words appear in three locations: (1) in the search query box, (2) in the breadcrumb below that box, and (3) in the related search below the breadcrumb. (<u>Id.</u>) A gray bar with the heading "Showing 10 Results" separates those three locations from the product listings below. (<u>Id.</u> at ¶ 6.)

Below the product listings, the "MTM" brand also appears in an advertisement under the heading "Sponsored Links." (<u>Id.</u> at Exh. A;

Levy Decl., Exh. A at 64:6-20.) The advertisement includes a hyperlink titled "Tactical Watches By MTM," the description "MTM Tactical Watches Worn By Military, Police, Sportsmen," and another hyperlink to MTM's website: www.specialopswatch.com/. (Jaye Decl. at Exh. A.)

**B. Product Detail Page**

Consumers cannot purchase products from Amazon's search results page. (Id. at ¶ 9.) To purchase a product, consumers first must navigate to a "product detail page" by clicking on a product listing. (Id.; Levy Decl., Exh. A at 63:14-19.) From there, consumers can purchase the product by adding the product to his or her cart or by using Amazon's "One-Click" option. (Jaye Decl. at ¶ 9.)

The product detail page includes a large image of the product, a hyperlink identifying the brand of the product, and a title identifying the product in larger font. (Id. at ¶ 10.) For example, the first product provided by Amazon's search function in response to the "mtm special ops" query is a product titled "Luminox Men's 8401 Black Ops Watch." (Id. at ¶ 9.) That watch's product detail page provides a large image of the watch's face, which identifies the Luminox brand, a hyperlink identifying the Luminox brand, and a title identifying the watch in larger font as the "Luminox Men's 8401 Black Ops Watch." (Id. at ¶ 10, Exh. C.)

On the product detail page, the words from the search query—"mtm special ops"—appear in the search query box. (Id.) A gray bar separates this box from the product detail page below. (Id. at ¶ 10.) Below the product detail page, Amazon suggests other products to the consumer under various headings. (Id. at Exh. C.)

One such heading, titled "Customers Viewing This Page May Be Interested in These Sponsored Links," displays sponsored hyperlinks titled "MTM Watches," with a link to www.yahoo.com, and "Military Watches Sale," which takes the consumer to cyber.monday.interiorsbuyer.com.  (Id.)

Accordingly, after navigating to a product detail page, the consumer can see the words "mtm special ops" in Amazon's search query box and a reference to MTM and its products in the sponsored advertisement.

**II. LEGAL STANDARD**

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine dispute of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  All reasonable inferences from the evidence must be drawn in favor of the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 242 (1986).

If the moving party does not bear the burden of proof at trial, it is entitled to summary judgment if it can demonstrate that "there is an absence of evidence to support the nonmoving party's case."  Celotex, 477 U.S. at 323.

Once the moving party meets its burden, the burden shifts to the nonmoving party opposing the motion, who must "set forth

1  specific facts showing that there is a genuine issue for trial."

2  Anderson, 477 U.S. at 256.  Summary judgment is warranted if a

3  party "fails to make a showing sufficient to establish the

4  existence of an element essential to that party's case, and on

5  which that party will bear the burden of proof at trial." Celotex,

6  477 U.S. at 322.  A genuine issue exists if "the evidence is such

7  that a reasonable jury could return a verdict for the nonmoving

8  party," and material facts are those "that might affect the outcome

9  of the suit under the governing law." Anderson, 477 U.S. at 248.

10 There is no genuine issue of fact "[w]here the record taken as a

11 whole could not lead a rational trier of fact to find for the non-

12 moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,

13 475 U.S. 574, 587 (1986).

14      It is not the court's task "to scour the record in search of a

15 genuine issue of triable fact." Keenan v. Allan, 91 F.3d 1275,

16 1278 (9th Cir. 1996). Counsel has an obligation to lay out their

17 support clearly.  Carmen v. San Francisco Sch. Dist., 237 F.3d

18 1026, 1031 (9th Cir. 2001).  The court "need not examine the entire

19 file for evidence establishing a genuine issue of fact, where the

20 evidence is not set forth in the opposition papers with adequate

21 references so that it could conveniently be found." Id.

22 **III. DISCUSSION**

23      In her concurrence to Playboy Enterprises, Inc. v. Netscape

24 Communications Corp., Judge Berzon presented the following

25 hypothetical:

26          I walk into Macy's and ask for the Calvin Klein

27          section and am directed upstairs to the second

28          floor. Once I get to the second floor, on my way to

6

1           the Calvin Klein section, I notice a more

2           prominently displayed line of Charter Club clothes,

3           Macy's own brand, designed to appeal to the same

4           people attracted by the style of Calvin Klein's

5           latest line of clothes. Let's say I get diverted

6           from my goal of reaching the Calvin Klein section,

7           the Charter Club stuff looks good enough to me, and

8           I purchase some Charter Club shirts instead. Has

9           Charter Club or Macy's infringed Calvin Klein's

10          trademark, simply by having another product more

11          prominently displayed before one reaches the Klein

12          line? Certainly not. . . .

13          . . . If I went to Macy's website and did a search

14          for a Calvin Klein shirt, would Macy's violate

15          Calvin Klein's trademark if it responded (as does

16          Amazon.com, for example) with the requested shirt

17          and pictures of other shirts I might like to

18          consider as well? I very much doubt it.

19   Playboy Enters., Inc. v. Netscape Communic'ns Corp., 354 F.3d 1020,

20   1035 (9th Cir. 2004)(Berzon, J., concurring).  This case squarely

21   presents the issue posed by Judge Berzon's final question: If I

22   search for one of MTM's trademarks, such as "mtm special ops," is

23   Amazon infringing when it presents me with a list of watches from

24   MTM's competitors?  MTM contends that Amazon is obliged to inform

25   the consumer that Amazon does not carry any products with that

26   brand before offering products from other brands in order to avoid

27   confusing the consumer.  Amazon maintains that so long as Amazon

28   labels the search results clearly as being from different brands,

consumers will get what they want from their searches and Amazon will not have infringed on MTM's trademark.  The crux of the matter is whether shoppers on Amazon are confused as to the source of the products displayed in the list of search results.

The Ninth Circuit recently dealt with a similar issue in Network Automation, Inc. v. Advanced Systems Concepts, Inc., 638 F.3d 1137 (9th Cir. 2011).  In that case, the owner of the trademark ACTIVEBATCH for business management software sued a competitor, Network Automation, who had purchased keywords such as "activebatch" from Google and Microsoft Bing.  Network Automation, 638 F.3d at 1142.  As a result, when users searched for "ActiveBatch," the results page would include sponsored links to Network Automation's website for its competing product.  Id.  The court stressed the importance of the labeling of the advertisements.  It pointed out that in Playboy Enterprises, the infringement claims "relied on the fact that the linked banner advertisements were 'unlabeled,' and were, therefore, more likely to mislead consumers into believing they had followed a link to Playboy's own website."  Id. at 1147 (citation omitted).  It declined to "expand the initial interest confusion[1] theory of infringement beyond the realm of the misleading and deceptive to the context of legitimate comparative and contextual advertising."  Id. at 1148.

---

[1] "Initial interest confusion is customer confusion that creates initial interest in a competitor's product.  Although dispelled before an actual sale occurs, initial interest confusion impermissibly capitalizes on the goodwill associated with a mark and is therefore actionable trademark infringement."  Playboy Enterprises, 354 F.3d at 1025.

1    To establish a trademark infringement claim under Section 32

2    or 43(a) of the Lanham Act,[2] a plaintiff has the burden to

3    establish that a defendant is "using a mark confusingly similar to

4    a valid, protectable trademark" of defendant's.  <u>Brookfield</u>

5    <u>Communic'ns, Inc. v. West Coast Entm't Corp.</u>, 174 F.3d 1036, 1046

6    (9th Cir. 1999).  Amazon argues that (1) it is not using MTM's mark

7    in commerce and (2) there is no likelihood that consumers will be

8    confused, and that Amazon is therefore entitled to judgment as a

9    matter of law.  MTM disagrees, asserting that there are disputed

10   issues of fact as to whether consumers are likely to be confused.

11   **A. Use in Commerce**

12   Because the court finds, as discussed below, that there is no

13   likelihood of confusion, the court need not resolve the issue of

14   whether Amazon is using the mark in commerce.  The court notes

15   briefly that the Ninth Circuit has held that the use of a trademark

16   as a search engine keyword that triggers the display of a

17   competitor's advertisement is a "use in commerce" under the Lanham

18   Act.  <u>Network Automation</u>, 638 F.3d at 1144-45.  This case is

19   distinguishable, insofar as Amazon is not selling trademarks to

20   competitors but instead is using behavior-based search technologies

21   that result in competitors' products appearing when a trademarked

22   search term is entered.  Nonetheless, because Amazon's use is in

23   connection with the sale of goods, it appears likely to be a "use

24

25   [2] "Any person who shall, without the consent of the
     registrant--(a) use in commerce any reproduction, counterfeit,
26   copy, or colorable imitation of a registered mark in connection
     with the sale, offering for sale, distribution, or advertising of
27   any goods or services on or in connection with which such use is
     likely to cause confusion, or to cause mistake, or to deceive . . .
28   shall be liable in a civil action by the registrant for the
     remedies hereinafter provided." 15 U.S.C.A. § 1114.

1  in commerce" both in the jurisdictional sense and with respect to

2  the statutory infringement requirement.

3      **B. Likelihood of Confusion**

4      Amazon claims that no reasonable trier of fact could find that

5  there is a likelihood of confusion resulting from Amazon's use of

6  MTM's mark(s).  Likelihood of confusion is the center of the

7  trademark infringement, unfair competition, and false designation

8  of origin claims in this case.  See <u>Toho Co. v. Sears, Roebuck &</u>

9  <u>Co.</u>, 645 F.2d 788, 790 (9th Cir. 1981); <u>Brookfield Commc'ns</u>, 174

10  F.3d 1036, 1046 (9th Cir. 1999).  The factors for determining

11  likelihood of confusion are: "1. strength of the mark; 2. proximity

12  of the goods; 3. similarity of the marks; 4. evidence of actual

13  confusion; 5. marketing channels used; 6. type of goods and the

14  degree of care likely to be exercised by the purchaser; 7.

15  defendant's intent in selecting the mark; and 8. likelihood of

16  expansion of the product lines."  <u>AMF Inc. v. Sleekcraft Boats</u>, 599

17  F.2d 341, 348-49 (9th Cir. 1979).[3]  It is unnecessary to meet every

18

19     [3] MTM argues that Amazon's behavior is a case of "passing off"
    or "palming off." "The tort of palming off by a third party dealer

20  is defined as the unauthorized substitution of the goods of one
    manufacturer when the goods of another are requested by the

21  customer." <u>K-S-H Plastics, Inc. v. Carolite, Inc.</u>, 408 F.2d 54, 59
    (9th Cir. 1969), <u>cert. denied</u>, 396 U.S. 825 (1969).  MTM compares

22  Amazon's behavior to the restaurant in <u>Coca-Cola Co. v. Overland</u>,
    Inc., 692 F.2d 1250, 1252 (9th Cir. 1982), where consumers who

23  specifically requested Coca-Cola were being served Pepsi-Cola.
    Menus and posted signs indicated that Pepsi-Cola was the only

24  beverage served in the restaurant.  <u>Id.</u> at 1253.  The court found
    that those indications were not "sufficiently conspicuous" and did

25  not provide adequate notice of the substitution.  <u>Id.</u> at 1253-54.
    Although the Ninth Circuit did not use the <u>Sleekcraft</u> factors in

26  resolving <u>Overland</u>, its concern with providing conspicuous notice
    to customers indicates a fundamental concern with potential

27  consumer confusion.  The <u>Sleekcraft</u> factors provide a flexible
    rubric for evaluating the likelihood of consumer confusion.  Thus,

28  the court finds no reason not to use those factors whatever
    (continued...)

factor because the likelihood of confusion test is "fluid". <u>Surfvivor Media, Inc. v. Survivor Prods.</u>, 406 F.3d 625, 631 (9th Cir. 2005).  The test is fact intensive, and it thus is rarely appropriate for deciding on summary judgment.  <u>Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.</u>, 457 F.3d 1062, 1075 (9th Cir. 2006).

The Ninth Circuit has advised courts to be "acutely aware of excessive rigidity when applying the law in the Internet context; emerging technologies require a flexible approach."  <u>Network Automation</u>, 638 F.3d at 1145-46 (quoting <u>Brookfield Commc'ns</u>, 174 F.3d at 1054).  "In determining the proper inquiry for this particular trademark infringement claim, [the court] adhere[s] to two long stated principles: the <u>Sleekcraft</u> factors (1) are non-exhaustive, and (2) should be applied flexibly, particularly in the context of Internet commerce.  Finally, because the <u>sine qua non</u> of trademark infringement is consumer confusion, when [the court] examine[s] initial interest confusion, the owner of the mark must demonstrate likely confusion, not mere diversion."  <u>Network Automation</u>, 638 F.3d at 1149.

---

[3](...continued)
subgenre of trademark infringement claim this case might present. MTM has offered no support for the proposition that cases that arguably concern passing off do not require a showing of likelihood of confusion.
    Additionally, the instant situation does not appear to be a case of palming off in the traditional sense.  It is akin to the consumer asking for a Coca-Cola and receiving a tray with unopened, labeled, authentic cans of Pepsi-Cola, RC Cola, Blue Sky Cola, Dr. Pepper, and Sprecher Root Beer, and a copy of <u>Coca Kola: The Baddest Chick</u>, by Nisa Santiago.  This is a substitution, but given the context it is not infringing because it is not likely to confuse.

1   The Network Automation court determined that "[g]iven the
2   nature of the alleged infringement [in that case], the most
3   relevant factors to the analysis of the likelihood of confusion
4   are: (1) the strength of the mark; (2) the evidence of actual
5   confusion; (3) the type of goods and degree of care likely to be
6   exercised by the purchaser; and (4) the labeling and appearance of
7   the advertisements and the surrounding context on the screen
8   displaying the results page." Id. at 1154. It found that certain
9   other factors were less relevant to the particular context.[4] The
10  factors deemed less relevant are the following:

11      Proximity of goods (factor 2): The court held that even though
12  the products were interchangeable (both were business management
13  software), that fact would "become less important if advertisements
14  are clearly labeled or consumers exercise a high degree of care,
15  because rather than being misled, the consumer would merely be
16  confronted with choices among similar products." Id. at 1150. The
17  same is true in this case; although both Amazon and MTM sell
18  watches, which are identical products, this is misleading only if
19  the consumer is confused, not if the consumer simply has clearly
20  marked options.

21      Similarity of marks (factor 3): The traditional Sleekcraft
22  analysis compares marks that are "similar in terms of sight, sound,
23  and meaning." Id. at 1150 (citing Sleekcraft, 599 F.2d at 351).

24

25      [4] MTM is correct that the Network Automation court did not
26  limit the likelihood of confusion analysis to the four cited
    factors. (Opp. at 11.) The Network Automation court instead
27  explained why certain factors were less relevant than others to
    evaluating confusion in the Internet advertising context. This
28  case is sufficiently similar to Network Automation that those
    factors are a useful starting point.

1  Here, as in <u>Network Automation</u>, "the consumer does not confront two
2  distinct trademarks." <u>Network Automation</u>, 638 F.3d at 1151.
3  Instead, the consumer types MTM's mark into the search box and then
4  sees the mark that he or she typed appear in several places on the
5  search results page, along with competitors' products.  It is
6  undisputed that consumers may be typing MTM's mark into the search
7  box and that in reproducing this mark, Amazon uses it identically.
8  The issue is not whether the marks are identical but whether
9  consumers are likely to be confused as to the source of the goods
10 returned in the search results. Therefore, this factor is not
11 independently relevant.

12     <u>Marketing Channels</u> (factor 5): "Convergent marketing channels
13 increase the likelihood of confusion." <u>Sleekcraft</u>, 599 F.2d at
14 353. "However, this factor becomes less important when the
15 marketing channel is less obscure. . . . "Given the broad use of
16 the internet today, . . . . this factor merits little weight."
17 <u>Network Automation</u>, 638 F.3d at 1151 (internal citations and
18 quotation marks omitted). The fact that Amazon and MTM are both
19 selling watches on the Internet is too commonplace to affect the
20 likelihood of confusion analysis.

21     <u>Intent to Confuse</u> (factor 7): The <u>Network Automation</u> court
22 pointed out that defendant's intent may be relevant, "but only
23 insofar as it bolsters a finding that the use of the trademark
24 serves to mislead consumers rather than truthfully inform them of
25 their choice of products." <u>Network Automation</u>, 638 F.3d at 1153.
26 Therefore, this factor, like proximity of goods, must be considered
27 in the context of the clarity of labeling.

28

The court agrees with Amazon that this case is similar enough to <u>Network Automation</u> that the factors identified in that case should be the starting point for its analysis.

### 1. Strength of the Mark

"The stronger a mark—meaning the more likely it is to be remembered and associated in the public mind with the mark's owner—the greater the protection it is accorded by the trademark laws." <u>Brookfield Commc'ns</u>, 174 F.3d at 1058. "Two relevant measurements are conceptual strength and commercial strength." <u>Network Automation</u>, 638 F.3d at 1149.

### a. Conceptual strength

"A mark's conceptual strength depends largely on the obviousness of its connection to the good or service to which it refers. The less obvious the connection, the stronger the mark, and vice versa." <u>Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt.</u>, 618 F.3d 1025, 1032-33 (9th Cir. 2010). "[W]hile the registration adds something on the scales, we must come to grips with an assessment of the mark itself." <u>Network Automation</u>, 638 F.3d at 1149 (citation and quotation marks omitted).

1    The marks at issue are MTM SPECIAL OPS and MILITARY OPS.[5]

2 Amazon asserts that the marks are descriptive because the watches

3 designated by the marks were designed for members of the armed

4 forces involved in special military operations or "ops". (See

5 Depo. Avicasis 149:19-150:19)("We design [the watches] for [Special

6 Operations Forces in the U.S. Military] . . . keeping in mind

7 that's what people on the field or soldier on the field needs.")

8 Amazon also submits a Google advertisement for MTM with the

9 description "Special Ops Watches worn by Special Ops and Special

10 Forces worldwide." (Levy Decl. ¶ 8, Exh. G.) Amazon additionally

11 references a query by the trademark office as to whether the

12 watches "are intended to be used in 'special operations' or by

13 'special operations' personnel or forces." (Levy Decl. ¶ 10, Exh. I

14 (emphasis omitted).) MTM's attorney responded, "The term Special

15 Ops is nothing more tha[n] a suggestive reference to military type

16 watches." (Levy Decl. ¶ 11, Exh. J.)

17

18    [5] MTM claims that it has three other marks at issue-PRO OPS,
AMERICAN WATCH, and MILITARY OPS- and that by not discussing them,
19 Amazon has waived arguments concerning their strength. It is not
clear to what extent the other marks are in use. The mark PRO OPS
20 appears on the back of watches only. (Levy Decl. ¶ 2, Exh. A,
Depo. Avicasis, president of MTM, 27:3-29:9.) The mark AMERICAN
21 WATCH is used for a company that sells premium promotion watches,
purchased by companies and inscribed with those company names. It
22 appears to be a mark for promotional watch services rather than for
watches. Mr. Avicasis stated that no watches are branded American
23 Watch, but that through American Watch MTM sells "premium promotion
watches" with company names on them, such that American Watch is a
24 "business name that a customer might look for if they were
interested in promotional watches." (Depo. Avicasis, 31:14-33:2.)
25    Be that as it may, while these three marks are arguably
distinctive enough to receive trademark protection for watches, at
26 least two of them are phrases ("pro ops" and "military ops") that
could well be used to search for products other than watches, and
27 "American Watch" could be used to search for many types of watches
unconnected with MTM. These marks therefore are weaker than MTM
28 SPECIAL OPS, and the court's analysis of MTM SPECIAL OPS applies
equally to those marks throughout the order.

1      The spectrum of distinctiveness, ranging from generic marks

2   with no distinctiveness to arbitrary marks with no connection to

3   the product, includes in the middle "descriptive marks, which

4   describe the qualities or characteristics of a good or service and

5   only receive protection if they acquire secondary meaning, and

6   suggestive marks, which require a consumer to use imagination or

7   any type of multistage reasoning to understand the mark's

8   significance and automatically receive protection." Fortune

9   Dynamic, 618 F.3d at 1033(alterations, internal citations, and

10  quotation marks omitted).

11      Amazon's evidence is persuasive in showing that the marks in

12  question are not strong; they are at best suggestive, and more

13  likely descriptive.  MTM argues that the marks are saved from

14  weakness by "MTM," but while this may be sufficiently distinctive

15  to acquire trademark protection, it is not distinctive enough to

16  neutralize the rest of the mark's descriptive connection to the

17  product.  Thus, this factor weighs in favor of Amazon.

18              **b. Commercial strength**

19      Amazon has presented evidence that U.S. watch sales totaled

20  $9.1 billion in 2011.  (Levy Decl. ¶ 3, Exh. B.)  It presents

21  evidence that U.S. watch advertising expenses totaled over $365

22  million in a recent year.  (Id. Exh. C.)  Based on these figures,

23  it calculates that MTM had a minuscule fraction of the U.S. watch

24  market in both sales and advertising expenditures.  (Levy Decl.

25  Exh. A (Depo. Avicasis).)  The evidence concerning the size of the

26  U.S. watch market is in the form of online articles, which MTM

27  argues are inadmissible hearsay.  Amazon does not suggest that the

28  evidence falls within a hearsay exception.

1    Without evidence showing MTM's market share, the evidence of
2    MTM's sales volume and advertising expenditures has little
3    significance.  Where a "mark has achieved actual marketplace
4    recognition," advertising expenditures may be able to "transform a
5    suggestive mark into a strong mark." Brookfield Commc'ns, 174 F.3d
6    at 1058.[6] Here, MTM has not presented evidence regarding its brand
7    recognition or its share of the market.

8        Although it is MTM's burden to establish likelihood of
9    confusion, MTM need not prevail on all the Sleekcraft factors to do
10   so.  Thus, the fact that MTM did not present evidence on this
11   particular sub-factor does not necessarily mean that the factor
12   weighs in favor of Amazon.

13       Therefore, this sub-factor is neutral, since neither side has
14   presented admissible evidence as to MTM's commercial strength.

15                    **c. Conclusion on strength**

16       Because Amazon has presented evidence that the mark is
17   conceptually weak, and neither side has presented admissible
18   evidence regarding the mark's commercial strength, the strength
19   factor weighs in favor of Amazon.

20   ///

21   ///

22

23       [6] "If a party plaintiff in a Board proceeding is to rely
24   simply on sales and advertising figures in an effort to establish
     that its mark is famous, then it is incumbent upon that party
25   plaintiff to place the sales and advertising figures in context,
     for example, by showing that the product is the leading product in
26   its category, the second leading product in its category etc. Raw
     sales and advertising figures -- unless they are extraordinarily
27   large, which is not the case with opposer's FOSSIL products -- are
     simply not sufficient by themselves to establish that the mark is
28   famous." Fossil Inc. v. Fossil Group, 49 U.S.P.Q.2d 1451 (P.T.O.
     T.T.A.B 1998).

### 2. Actual confusion

"[A]ctual confusion is not necessary to a finding of likelihood of confusion under the Lanham Act."   <u>Network Automation</u>, 638 F.3d at 1151 (internal quotation marks omitted). However, "[a] showing of actual confusion among significant numbers of consumers provides strong support for the likelihood of confusion."   <u>Id.</u> (quoting <u>Playboy Enterprises</u>, 354 F.3d at 1026).

### a. Evidence of no confusion

This case presents an unusual situation where one party claims to have evidence that there is no actual confusion, not simply that there is likely not confusion.  Amazon purports to present such evidence.  Amazon retains and has presented data pertaining to individual search queries and the number of purchases resulting from them in the same day.  (Jaye Decl. ¶ 12, Exh. D.) It provides the data regarding how often a consumer's search for "mtm special ops" or "mtm special ops watch" results in the consumer placing a product in a shopping cart or in a purchase.  (<u>Id.</u>)  Amazon then contrasts the same data for search queries for "luminox" (a major competitor of MTM) or "luminox watch."  (<u>Id.</u> at ¶ 15, Exh. F.) Consumers are twenty-one times as likely to purchase a product when searching for Luminox as when searching for an MTM Special Ops brand.  (<u>Id.</u> at ¶¶ 14-15.)  Based on this data, Amazon concludes that there is no actual confusion: "[i]f consumers were actually confused into believing that MTM was the source of a Luminox watch displayed when a user searches for 'mtm special ops' or 'mtm special ops watch,' one would expect that a substantial percentage

1 of consumers who searched for those terms would have purchased such

2 a watch."[7] (Mot. at 17.)

3     MTM critiques this data for registering only those sales and

4 selections made on the same day the search was performed, whereas,

5 by Amazon's own account, there are reasons why a consumer might put

6 a product into the cart but purchase it at a later date.  Amazon

7 persuasively responds that the value of this data is not absolute

8 but relative; there is no reason to think that those consumers

9 searching for Luminox would exhibit different behaviors from those

10 searching for MTM Special Ops.  Because the "luminox" search is

11 more than twenty-one times as likely to result in purchase, the

12 court finds that Amazon has presented evidence that there is no

13 actual confusion.

14     Additionally, MTM points to evidence that search queries for

15 "mtm" were much higher than for "mtm special ops."  The average

16 price of the units sold based on a search for "mtm" was

17 dramatically lower than the prices of MTM's competitors' watches.

18 (Cohen Decl. Exh. C; Jaye Decl. ¶ 6, Exh. A.)  Therefore, this is

19 not evidence that a consumer searching for an MTM watch on Amazon

20 is confused and as a result buys a competitor's watch.

21            **b. Evidence of actual confusion**

22     MTM's president Yoav Avicasis testified that he had knowledge

23 of actual confusion, but he was unable to present any specific

24

25

26

27     [7]The fact that people are searching for "mtm special ops
watch" and not purchasing anything suggests that they may be
28 searching for that watch in particular. This could be, but is not
used by MTM as, evidence of the strength of the mark.

1  instances or records of actual consumer confusion.[8]  (Depo.

2  Avicasis 69:10-85:16, 86:25-87:1, 146:12-149:18.)  His testimony is

3  too vague to constitute evidence on this point.

4  **3. Degree of care and type of goods**

5  MTM's watches range in price from several hundred dollars to

6  two thousand dollars.  (Levy Decl. ¶ 2, Exh. A at 37:17-25.)

7  "[W]hen the goods are expensive, the buyer can be expected to

8  exercise greater care in his purchases; again, though, confusion

9  may still be likely." Network Automation, 638 F.3d at 1152

10  (quoting Sleekcraft, 599 F.2d at 353)(internal quotation marks

11  omitted).  Because watches sold by MTM's competitors are relatively

12  expensive, they would seem to involve a high degree of care.

13  MTM contends that buyers may not know the price range before

14  searching on Amazon and that therefore care may not necessarily be

15  presumed, since Amazon's price range for watches is very broad,

16  going as low as $14.00. That may be so in general, but the least

17  expensive watch that results from the search query "mtm special

18  ops" is $145.00, and the first five watches displayed are listed

19  for $299.00, $687.73, $320.00, $196.33, and $385.00. (Jaye Decl.,

20  Exh. A.)

21  The court finds that the relatively high price of the goods in

22  question, combined with the increased degree of care used in

23  Internet purchases, mean that consumers are presumed to use a high

24  degree of care in such purchases.[9]

25  _____

26  [8] Amazon also asserts that most of this testimony would be

27  inadmissible hearsay, since Mr. Avicasis stated that complaints go
to the consumer affairs department.

28  [9]"[T]he default degree of consumer care is becoming more
(continued...)

### 4. Labeling and context

"In the keyword advertising context the likelihood of confusion will ultimately turn on what the consumer saw on the screen and reasonably believed, given the context." Network Automation, 638 F.3d at 1153 (internal quotation marks omitted). The same central issue is at play where online retail search results are concerned.

MTM offers an expert report to prove that Amazon's search results are "ambiguous, misleading, and confusing." (Decl. Markson ¶ 3, Exh. 1 p. 9.) Markson arrives at the following conclusion:

> In my opinion, Amazon has created some very useful and innovative technology. However, they present their results in a misleading fashion and should better explain to users what they're looking at in order to avoid confusion.
>
> It would appear that they are doing what is best for sales. In many cases, the BBS derived data is very useful for users but when presented in the exact manner as they have done, it can also be very misleading. This is particularly evident in the case of certain trademark products that are not carried on the site.

Id. at pp. 17-18.

Markson's analysis suggests that consumers may be confused about why they are receiving certain search results. He compares the Amazon results page to pages from other search engines and

---

[9](...continued)
heightened as the novelty of the Internet evaporates and online commerce becomes commonplace." Network Automation, 638 F.3d at 1152.

points out potential confusion.  For instance, "[s]ome users with sufficient computer experience" may believe that because their search term appears in quotation marks below the search box, the site searched for that specific phrase in generating the search results.  (Id. at 9.)  Or, the user might see a strike-through in one term and not in another and believe that the remaining search results must include the term "mtm."  (Id.)

Be that as it may, Markson did not conduct a study to determine whether users of Amazon are likely to be confused as to source.  Absent such a study, the evidence Markson presents is relevant to show that consumers may be confused about how the site functions, but it does not indicate that they are confused as to the source of the products.  A consumer could, for instance, puzzle over why the search query "mtm special ops" produced a results page listing ten watches but none of them with the MTM brand without also being confused as to the source of the watches presented on the results page.  Markson's report goes only to the first issue.

Given this, the court finds that MTM has presented no evidence that consumers are likely to be confused as to source, as required by the statute.[10]  The court does not hold that such evidence could

---

[10] The statute requires that a use of a mark "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person."  15 U.S.C.A. § 1125.

1  not be presented through a consumer survey,[11] for instance, only

2  that it has not been presented here.

3            **5. Conclusion on Likelihood of Confusion**

4      The court finds that the analysis of the relevant <u>Sleekcraft</u>

5  factors establishes that there is no likelihood of confusion in

6  Amazon's use of MTM's trademarks in its search engine or display of

7  search results.

8      **IV. CONCLUSION**

9      For the reasons stated, the court GRANTS the motion.

10 IT IS SO ORDERED.

11

12

13 Dated: February 20, 2013

14                                      DEAN D. PREGERSON

15                                      United States District Judge

16

17

18

19

20

21

22

23

24

25  _____

26    [11] The court also notes that there could potentially be a
    likelihood confusion if the search results included products with
27  marks that were substantially similar to the mark used as a search
    query.  Here, however, the marks of the watches listed in the
28  search results bear little if any resemblance to MTM's mark. Thus,
    the court need not reach this issue.

                                   23